1

2

3
**UNITED STATES DISTRICT COURT**

4
**NORTHERN DISTRICT OF CALIFORNIA**

5
**SAN JOSE DIVISION**

6

7
JUAN JOSE DEANDA,

Plaintiff,

Case No.  13-cv-02135-BLF

8

9
v.

**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

10
RAYMOND MADDEN,

Defendant.[1]

11
[Re:  ECF 8]

12

13
Juan Jose Deanda, a state prisoner represented by counsel, filed an amended petition for

14
writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state criminal conviction for

15
two counts under California Penal Code § 288(a) (lewd or lascivious act on a child under the age

16
of fourteen). ECF 8. Petitioner asserts two exhausted claims: instructional error leading to a due

17
process violation and ineffective assistance of counsel. Respondent filed an answer and response

18
addressing the merits of the two claims, and exhibits in support thereof. ECF 13, 14. Petitioner

19
filed no traverse.[2] Having reviewed the briefs and the underlying record, the Court concludes that

20
Petitioner is not entitled to relief and DENIES the amended petition.

21
**I.     BACKGROUND**

22
In 2009, Petitioner was tried and convicted in Santa Clara County Superior Court. A jury

23
found Petitioner guilty of two counts of lewd or lascivious act on a child under the age of fourteen,

24

25
[1] Respondent's request that Raymond Madden be substituted for Amy Miller is GRANTED. *See*

26
Fed. R. Civ. P. 25(d).
[2] Pursuant to the Court's Local Rule 2254-6(c), Petitioner's traverse or reply to Respondent's answer was due within 30 days after Respondent filed the answer. Habeas L.R. 2254-6(c); *see also*

27
*See* Rule 5(e) of the Rules Governing Section 2254 Cases advisory committee's note (allowing time for reply to be set by local rule). Petitioner did not request an evidentiary hearing or oral

28
argument as provided in Habeas L.R. 2254-7 and 2254-8.

United States District Court
Northern District of California

and found true the allegation that petitioner committed the acts against more than one victim. Ans. Exh. 1 (Clerk's Transcript ("CT")) at 204, 207, 211, ECF 14-1. On March 5, 2010, the trial court sentenced Petitioner to 30 years to life in state prison. *Id.* at 259.

Petitioner appealed and, on July 26, 2011, the California Court of Appeal issued a written opinion affirming the judgment and denying a petition for writ of habeas corpus. Ans. Exh. 9 ("Cal. Ct. App. Order"), ECF 14-5. On October 26, 2011, the California Supreme Court denied petitions for review in both the direct review and habeas cases. Ans. Exhs. 13, 15, ECF 14-5. On May 14, 2012, the United States Supreme Court denied a petition for writ of certiorari. Ans. Exh. 16, ECF 14-5.

Petitioner initiated this case on May 9, 2013, asserting both exhausted and unexhausted claims. ECF 1. On October 16, 2014, the Court granted Respondent's motion to dismiss on that basis with leave to amend. ECF 7. In his amended petition, Petitioner raises two claims for relief, both of which have been exhausted for the purpose of federal habeas corpus review. ECF 8.

## II.   SUMMARY OF EVIDENCE AT TRIAL

In its written opinion, the California Court of Appeal fairly and accurately summarized the factual background of Petitioner's case at trial as follows:

1. *Prosecution's Case in Chief*

On April 17, 2007, San Jose police officers were dispatched to an apartment complex with regard to a possible lewd act with a child. The officers went to apartment number 10, where the alleged victim lived. The officers also went to apartment number 33, where the suspect, defendant Deanda, lived. Inside the suspect's apartment, there was a kitchen table, with Fritos and various candies on it, and a chair next to a window.

J.'s mother testified that she was living in apartment number 10 in April 2007. She called the police after an incident involving her then six-year-old daughter J., a kindergartener and the oldest of her three children. Her daughter J. asked her for money to buy an ice cream and soda from the woman who lived in an upstairs apartment with her son. The woman sold sodas, snacks, chips, candy, and ice cream from the window of her apartment to children and adults living in the complex. J. went up the stairs.

The next thing J.'s mother saw was her daughter J. running down the stairs and, when J.'s mother asked her what happened, J. told her "[t]he man tried to touch my parts." J.'s mother said, "'What, your conchita?'" J. replied, "'Yes.'"

"Conchita" was the word they used to refer to "her intimate part, private part, where she goes pee." Her daughter was very scared. It was important to J.'s mother to know whether the man had touched her or merely tried to touch her. Her daughter clarified that the man did touch her. He stuck his hand underneath her skirt and grabbed at her vaginal area. But J. was wearing shorts underneath. He told J. to come inside, he scratched her, and she ran.

J.'s mother told her daughter to go buy the ice cream but she did not want to go. She told her daughter that she would follow her. She wanted to identify the man. When they got there, her daughter said, "That's the one."

J.'s mother went downstairs to her apartment and told her daughter that she was going to call the police but first she was going to get clothes that were drying. She apparently ran into defendant downstairs and he asked her, "'Ma'am, do you know what happened to my car?'" She answered no but indicated that she knew what he had done to her daughter and she was going to call the police.

J.'s mother called the police and spoke with an officer in Spanish while everything was fresh in her mind. She acknowledged that J. described a man reaching through the window to touch her. She could not remember telling the police that her daughter told her that he touched her vaginal area with an open hand. She could not remember telling officers that the touching incident had occurred the day before she called police.

A few weeks later, J.'s mother received a phone call from Officer Michel, another police officer, and they discussed what had happened to her daughter. The events were then still fresh in her memory. J.'s mother admitted telling Officer Michel that J. first told her that the man had tried to touch her and J. only later told her that the man did touch her.

J.'s mother variously reported that defendant had tried to touch or touched her daughter J. J.'s mother later explained that she had meant that he touched J.'s shorts, not J.'s panties.

J. testified that she was eight years old and in third grade at the time of trial and would be turning nine the following month. She explained that when she was in kindergarten, her mother told her "to buy sodas and she [her mother] didn't know that he did bad stuff, and I went up to buy sodas and he . . . tried to touch me." In court, J. identified "he" as defendant.

At trial, J. pointed out in a photograph the apartment window from which a man and a woman usually sold sodas. When she went to the window to buy sodas, defendant was there. J. said she was wearing a flowered pink skirt and red shorts underneath. She said he touched her private part with his hand and she felt his touch. J. ran to her mom.

J. remembered talking to the police who first came to the apartment and she remembered later talking to another police officer in a special room. She did her best to tell the truth both times. She admitted it was hard to remember what

3

happened that day. Although she remembered being shown a picture of a little girl during the second interview, she could not recall circling a part of the girl's body on the diagram. But she confirmed that the area circled in the diagram was the private part that defendant touched and she called it "my parts."

On cross-examination, J. initially agreed that defendant reached out of the window and touched her but then she was unsure. She remembered telling police that the man reached out of the window. She did not remember telling the officer during the second interview that the man tried to lift her skirt. She did not remember telling that officer that she could not feel his hand on her part. J. could not remember how long the incident lasted. But she confirmed that the touching happened outside the apartment.

According to Officer Omar Sanchez, one of the officers dispatched to the apartment complex on April 17, 2007, J.'s mother informed him that her daughter had told her that a neighbor had "touched her in a private area." J.'s mother was clear that her daughter had been touched. J.'s mother reported to him that, on April 17, her daughter asked her for money to buy ice cream. J.'s mother had given the daughter money and then noticed the daughter was hesitating to go buy the ice cream and asked her daughter what was wrong. The daughter said she did not want to go to the apartment because she was afraid she would be touched. J.'s mother reported that her daughter had told her that the previous day, April 16, she had gone to the apartment to buy soda and knocked on the window. The man had opened the window and asked what she wanted. When she told him she wanted some sodas, he "reached out from the window, and with an open palm touched her in her vaginal area." J.'s mother told the officer that, after learning what had happened, she and her daughter had gone to the apartment and identified defendant as the man who had touched her daughter.

Officer Sanchez also talked with J. alone. J. told him that the previous day she had asked her mother for money to go to buy soda. When she got there, she knocked on the window and then spoke to defendant. As she asked for the soda, defendant reached out and with an open palm touched her in the vaginal area. When he asked her where she had been touched, she pointed toward her vaginal area. Defendant had told her to come inside his apartment and she had run home. J. told the officer where the suspect lived on the second story. Officer Sanchez then contacted the suspect.

At trial, Officer Sanchez pointed out apartment 33, the upstairs unit where defendant lived, in a photograph of the building and he identified a photograph of the inside of the apartment. He identified defendant as the suspect whom he had contacted. His report recorded J.'s height as three feet, five inches and defendant Deanda's height as five feet, five inches.

On May 11, 2007, San Jose Police Detective Monica De La Cerda, a certified Spanish speaker and member of the sexual assault unit, recorded a telephone conversation with J.'s mother that had taken place in Spanish. J.'s mother explained that she had sent her daughter upstairs to get a soda from the woman who sold items such as ice cream, soda, and candy from her home, apartment

4

number 33. Her daughter quickly returned without the soda and J.'s mother learned that her daughter was afraid and while the daughter was "up there getting the soda" "a man in that apartment had touched her." The daughter informed her mother that the man had touched her in the vaginal area and told her to come inside the apartment but the daughter had run home. J.'s mother said that her daughter first told her that the man had tried to touch her vaginal area. The mother had said to her daughter, "I need you to tell me the truth." The daughter then said that he did touch her.

About four days after the phone conversation between J.'s mother and Detective De La Cerda, J.'s mother brought J. to the children's interview center to be personally interviewed by the detective. As a sexual assault investigator, Detective De La Cerda had more experience and specialized training in interviewing child victims of sexual assault than other officers. Detective De La Cerda wanted to clarify whether J. had actually been touched and whether the window's size would permit somebody to have reached through the window.

During the interview, J. said that she had gone upstairs to buy a soda. She said she was wearing a black skirt with colored flowers and shorts underneath. J. repeatedly said a man had touched her with his hand and indicated that he had touched her vaginal area. She said that they were both outside by the window when the touching occurred. The detective showed a diagram to J. and asked her to circle the part of the body where she had been touched by defendant. J. circled the vaginal area. J. told the detective that the man had touched her on her skirt and she had shorts underneath. When asked whether she could feel the man's hand on her part, she said that she could not. When the detective asked whether it hurt when the man touched her, she said that it did hurt and pointed to her vaginal area.

P., the alleged victim in count two, testified. He recognized apartment 33 in the photograph as the apartment where his grandmother still lived. It was a two-bedroom apartment and his Uncle Johnny lived there with his grandmother. At one point, he said he remembered her living there for about two years. But he then testified that he remembered going to that apartment since he was seven years old and he was 14 years old at the time of trial.

P. recalled that when he was about seven or eight years old, his Uncle Johnny, his mother's brother, touched his "private" and made P. touch his uncle's "privates" by grabbing P.'s hand and putting it under his uncle's pants. At the time it happened, P. did not tell anyone. At trial, he identified defendant as his Uncle Johnny.

According to P., when he was 13 years old, he began to remember what his uncle had done while he and his little sister were grappling for the TV remote control and tickling each other. P. told his sister to stop because he "didn't want to make the same mistake as [his uncle]" and told his sister he did not want to play anymore. His mother was angry about his behavior and P. went straight to his room. When his mother, who was mad, came to his room, P. told her what had happened with his uncle when he was about seven or eight. His mother reported

5

the incident and a police officer came to talk to him at school in 2008, about a year before trial.

P. described the touching incident involving defendant, which had taken place in his grandmother's apartment. His mother, his two sisters, and he had gone to stay with his grandmother because she was sick and his mother wanted to take care of the grandmother. His grandmother was in her bedroom with P.'s mother and two sisters. P. was in the living room watching defendant, who was lying on the couch and playing PlayStation 2. Defendant told P. to come close so P. could see; P. lay down next to defendant. After a little while, defendant slowly reached under P.'s boxers and shorts, defendant put his hand on P.'s testicles and "private," by which P. meant penis. Defendant also slowly grabbed P.'s right hand and held it "a little bit tight" and put it under his own boxers and placed P.'s hand onto defendant's testicles and "private." P. recalled that it felt weird to have his hand under his uncle's underwear and he was confused and did not know what was happening. When asked if it was his choice to put his hand there, P. replied, "I'm not sure." Defendant was moving P.'s hand "upward, down" on defendant's private area. It felt to P. like "[s]omebody else was choosing" where his hand went. P. felt defendant's hand on his skin and P. felt defendant's skin. Defendant held P.'s hand on defendant's private area for about one or two minutes. When P.'s mother came of his grandmother's room, defendant quickly removed his hand and P.'s hand. P. thought that his mother did not see anything.

P. recalled that he was sent to bed but he could not sleep. At the time, he did not understand what had happened and he was confused; he did not tell anybody. P. continued to see defendant and nothing like that ever happened again. He stated that, during the previous school year, he started to remember what happened to him while learning about sex in school.

On cross-examination, P. agreed that he had previously stated in court that learning about abuse in school jogged his memory and prompted him to tell his mother about the touching incident. He acknowledged that he had not told police about the tickling incident with his sister and being in trouble with his mother but said that the officer did not ask him that type of question.

P. acknowledged that he had previously talked with someone from Child Protective Services (CPS) about being hit by his father. The CPS interview was in response to a June 24, 2003 referral. P. could not remember that he had no bruises or marks on him that day and he could not remember saying that his father hit him all the time. He said he had been using his own words.

At trial, P.'s mother indicated that, on the day in 2008 when P. disclosed the incident with defendant, she had been surreptitiously listening to P. and his younger sister playing in her bedroom because she was concerned when it became very quiet and "[t]hey were touching the bodies" and she did not like them to be "touching their bodies." When P. came out, she lied that she had seen the way they were playing and took him to his room because he was in trouble. She asked him why he was playing that way and indicated that she did not like the way he was behaving. He told her about the incident with his uncle, whom

P.'s mother identified in the courtroom as defendant. The next day, they talked more about the incident.

P.'s mother testified that P. told her that his uncle and he had been playing Nintendo while lying down in her mother's living room and defendant had touched P.'s private parts and then had taken P.'s hand to touch his own private parts. P. said the touch was under their clothing. P. had wanted to play Nintendo and defendant had said, "it's all right, let him play with me for a while, for a little longer." When she later came out of the bedroom and turned toward the living room, P. and defendant stood up and they appeared surprised. She told P. to go to sleep.

When she heard about the incident from P., she remembered when it had happened. She and her children were sleeping at her mother's house and her mother, her daughters, and she had gone to the mother's bedroom.

P.'s mother reported the incident to a counselor at Kaiser. She was contacted by a detective.

Carl Lewis testified as an expert on "Child Sexual Abuse Accommodation Syndrome" (CSAAS). The syndrome is information to debunk myths or mistaken beliefs about how sexually abused children behave. Dr. Roland Summit coined the term and he believed it was important to make the adult community aware of the commonly held, but erroneous, beliefs that caused people to incorrectly reject children's allegations of sexual assault.

The five CSAAS categories include (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, unconvincing disclosure and (5) retraction. CSAAS is not a scientific instrument; it is not diagnostic. The main message of the syndrome is to not reject a child's testimony out of hand but to look at the whole picture.

Lewis testified that secrecy describes the fact that sexual abuse occurs when the offender is alone or somehow isolated with the child. The abuse may occur in a public setting, but the offender may camouflage the behavior so it is not readily recognizable. The offender may go to some length to create an atmosphere of secrecy. The offender might wait until everyone else has gone to bed or left the house or the offender might go to a secluded part of the house, close the door, and turn up the television to muffle any sound. An offender can reinforce this sense of secrecy verbally or nonverbally. The offender might by a knowing glance communicate that this is a secret. The offender might indicate disclosure would cause bad things to happen, get the child in trouble, or not be believed or the offender might make overt threats such I will kill you, your family or your dog. The child receives the message that the child cannot talk about the abuse.

According to Lewis, child sexual abuse victims can experience a sense of helplessness because they are unable to resist, physically or emotionally, the sexual advances of an adult, particularly a loving, trusted adult. The struggle to bring disclosure of sexual abuse to light reinforces the feeling of helplessness. It

is common for a child victim to "let out a little bit of information and then gauge the reaction, and if the child feels safe then the child might let out a little bit more information." Sometimes a non-offending caretaker will not recognize a cry for help, such as a child victim saying he does not want to be left alone or go to the store with someone, and the child will think that "I tried to get help, but it didn't work."

Lewis testified with regard to entrapment and accommodation that, when children are suffering sexual abuse and trapped by circumstances, they accommodate so they can go on with their lives, such as going to school or interacting with friends. The most common accommodation is acting as if nothing is wrong or actually denying anything is wrong if asked outright. The fact that a child continues to interact with or be around the offender does not necessarily mean that the abuse did not happen.

Lewis explained the disclosure is delayed, conflicted and unconvincing primarily because of the internal conflict of the children, who are weighing the pros and cons of disclosure. Since the consequences of disclosure may be unknown, children victims may delay disclosing the abuse. Delay is common. Children victims may give seemingly conflicting statements regarding what occurred. Children might minimize what occurred by saying the offender "tried to" molest them. Children also might not be familiar with certain terminology and there may be communication gaps and misunderstandings. Children have difficulty remembering how they initially reported the facts. When a child finally makes a disclosure, it is usually done at a time or in a manner that makes the child unbelievable, such as when a child is being disciplined.

Lewis explained the last category of retraction. Because disclosure of abuse can cause uncomfortable attention to be focused on a child and the child's family and disrupt the family, the child may want things to go back to how they were before and either minimize the abuse or completely take back allegations.

2. *Defense Case*

At the time of trial, Coleen Kohtz was the law enforcement liaison and after hours coordinator for the Santa Clara County Department of Social Services. In 2003, she was an emergency response social worker and investigated child abuse allegations made on the Department's hotline. She investigated a referral, dated June 24, 2003, made by a Kaiser therapist indicating that a mother reported that her son P. was being hit with a belt and shoe by his father. She contacted and spoke with P., who was eager to speak with her. P. told her that his father hit him all the time. She did not personally observe any marks or bruises but acknowledged that there are not always visible bruises. P. could not be specific about the last time he had been hit and did not appear to be using his own words. On cross-examination, she agreed that the fact that a child has no bruises, or is eager to speak with her, or is not using his own words does not necessarily mean that the child was not beaten.

William VanCaleave, a Santa Clara County investigator with the Public

8

Defender's Office, took measurements of the relevant window of apartment 33. The base of the window to the ground was 36 inches or three feet. The left pane, looking at the window from the outside, slid to the right and was 22 inches wide. The window ledge was six inches wide from the inside to the outside.

Defendant Deanda testified on his own behalf. He had very recently turned 36 years old. He lived at the apartment complex from 1995 through 2007. He was living in apartment number 33 during the time period when the incident with P. allegedly occurred and in April 2007 when the incident with J. allegedly occurred.

Defendant had known his nephew P., his sister's son, since P. was born. He saw his sister and her children every day because they visited his mother. He said his family "practically live[d] at [his] house." Defendant testified that P.'s family visited the apartment a lot and he had played PlayStation with P. many times. He testified that his mother was frequently unwell and she been sick all the time since 2000.

Defendant could not remember the particular day that P. was taking about. According to defendant, P. was lying. He did not know why P. would say something like that.

Defendant identified the table in his apartment with candies on it in a photograph. Defendant acknowledged that his mother and he sold candy and sodas from their apartment window to residents of the apartment complex but said that his mother was the primary salesperson. It was a common practice in the Hispanic community. After school and after work were busy times.

Defendant acknowledged seeing J. a couple of times at the apartment complex. On April 17, 2007, defendant saw J. on his way out of his apartment. When he opened his door, she was outside and asked him for some ice cream. Defendant went to get some ice cream from the kitchen and opened the fridge and, as he was asking her what flavor, he saw J.'s mom grab J.'s arm and pull her from the doorway. He was arrested that day.

Defendant denied that J. had come to the window to buy soda on April 16 and denied that he had reached through the window and touched J. and told her to come inside the apartment. He did not know what she was talking about. He indicated that nothing like that had happened.

On cross-examination, defendant was unable to remember the time between 2002 and 2004 when his mother had been ill upon her return from Mexico and his sister and her children, including P., had spent the night at his apartment in order to care for his mother with whom he lived. Defendant indicated that his sister probably slept over at the apartment two or three times a month between 2002 and 2004 and his mother was sick every time she returned from Mexico. Defendant ultimately admitted that it was "not that often" that his mother returned from Mexico and his sister "felt she needed to spend the night to help take care of her." Defendant eventually conceded that his mother went to Mexico at most once a year.

9

On cross-examination, defendant acknowledged that he sometimes played PlayStation lying down. But he denied he played it lying down on the couch as described by P. He then claimed to have "laid down on the couch . . . but not all the way." He finally asserted that he had never played PlayStation lying down because "you can't really play it." When asked if P. was wrong when he said defendant was lying down playing PlayStation, defendant replied, "I guess."

When asked on cross-examination whether he recalled "any occasions where you said to [P.], hey, come over and watch what I'm playing on PlayStation," defendant replied, "Lots of times." Later, defendant repeatedly denied ever saying to P., "come here . . . while I play PlayStation."

On cross-examination, defendant confirmed that "many times" he and P. "would be up together while everyone else [was] in another bedroom with the door closed." He indicated the lights were probably off. But he later testified that it had never happened that his mom, sister and nieces were in his mother's room with the door closed because the door was always open. He also denied that he and P. were ever in the living room with the lights off.

Defendant denied ever lying next to P. on the couch and he testified that P. had lied when he said the two of them had been lying next to each other on the couch. He denied putting his hand on P.'s penis and taking P.'s hand and putting it on his own penis. He claimed that he had a good relationship with P.

On cross-examination, defendant could not recall ever selling anything to J. out of the window. But when subsequently asked whether he sold things to J. out of the window, he said, "Yeah." He admitted selling her candies and soda. He testified that he had sold sodas to J. only once or twice. He later testified that he had sold sodas to her "[p]robably two or three times." Defendant described placing one knee on the chair next to the window and putting items on the window rail.

Defendant maintained that, if J. said she had come to the window on either April 16 or April 17, she was lying. He denied ever reaching out the window and grabbing J.'s vaginal area. He said J. had come to his door and asked for ice cream on April 17. People usually come to the window and it was unusual for J. to knock on the door.

On cross-examination, defendant could not recall J. or her mother saying anything before J. was pulled away. He could not remember J.'s mother, while she was standing in front of his apartment, asking her daughter J., "Is that him?" When questioned whether he was saying he did not remember, defendant revised his answer, stating, "It didn't happen actually." The prosecutor inquired, "And you told the police that you could see the mom pointing at him and asking the victim, 'Is that him'?" Petitioner then recalled that the mother had pointed at him and asked, "Is that him?" but that exchange had occurred when he was "coming from the parking lot." Defendant asked J.'s mother what was going on and the mother accused defendant of touching her daughter.

Defendant maintained that neither P. nor J. was truthful.

Ans. Exh. 9 (Ct. App. Decision) at 4-17.

### III.   LEGAL STANDARD

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in State court unless the State court's adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the relevant State court decision. *Id*. at 412.

Under AEDPA, the federal habeas court must accord a high level of deference to State court decisions. *See Harrington v. Richter*, 131 S.Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S.Ct. 1305 (2011) (per curiam). A federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

1    Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

2    In other words, the writ may be granted only "where there is no possibility fairminded jurists

3    could disagree that the state court's decision conflicts with [the United States Supreme Court's]

4    precedents." *Harrington*, 131 S.Ct. at 786 (2011). Furthermore, if constitutional error is found,

5    habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in

6    determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v.*

7    *Abrahamson*, 507 U.S. 619, 638 (1993)).

8        The State court decision to which Section 2254(d) applies is the "last reasoned decision" of

9    the State court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423

10   F.3d 1085, 1091–92 (9th Cir. 2005). When there is no reasoned opinion from the highest State

11   court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. *Ylst*,

12   501 U.S. at 805. The last reasoned State court opinion on Petitioner's claims of instructional error

13   and ineffective assistance of counsel is the California Court of Appeal's consolidated denial of his

14   direct appeal and habeas petition. *See* Cal. Ct. App. Order.

15   **IV.    DISCUSSION**

16       **A.    Claim One**

17       Petitioner sets forth his first claim as follows: "Claim One: The trial court deprived

18   Petitioner of his due process right to a fair trial under the Fourteenth Amendment when it

19   proceeded to give new post-summation jury instructions over the objection of trial counsel and

20   indicated to the jury that the evidence was sufficient to convict of the lesser included offense under

21   the new instruction." Att. A to Petition ("Att. A") at 1, ECF 8.

22       **1.    Background**

23       The Court begins its review of this claim by summarizing the additional facts regarding the

24   trial court's instructions to the jury. Before the trial began, the court asked whether either party

25   anticipated requesting an instruction regarding lesser included offenses. Ans. Exh. 3-B (2

26   Reporter's Transcript ("2 RT")) at 28:27-29:1, ECF 14-2. At that point, Petitioner was charged

27   with three counts under § 288: count one against I. in violation of § 288(a); count two against P.

28   by use of force, violence, duress, menace and fear of immediate unlawful bodily injury in violation

United States District Court
Northern District of California

United States District Court
Northern District of California

1   of § 288(b); and count three against J. in violation of § 288(a). Cal. Ct. App. Order at 2. The

2   government responded, "No thank you," and defense counsel stated, "I'll have to see the way the

3   evidence comes out before I know." 2 RT 29:2-4.

4         Over the course of the trial, the government dropped the initial count one and Count One

5   became the count against P. in violation of §288(b) and Count Two became the count against J. in

6   violation of § 288(a). After both sides rested, the court asked for the parties' "conclusion[s]

7   concerning lesser included offenses." Ans. Exh. 3-C ("3 RT") at 272:1-2, ECF 14-2. Defense

8   counsel responded that "[t]he only lesser that defense is going to be requesting is the attempted as

9   to Count 2," and agreed that "on Count 1, the defendant is not asking for instructions about any

10  lesser included offenses." *Id.* at 272:3-4, 273:12-19. The government agreed to this approach,[3] *id.*

11  at 272:20-23, 272:3-13, as did Petitioner himself, *id.* at 275:3-276:1.

12        On the morning of December 2, 2009, the court instructed the jury as to § 288(b) for Count

13  One and § 288(a) for Count Two. *Id.* at 277:8-94:20. As part of its instructions, the court

14  admonished the jury, "Pay careful attention to all of these instructions and consider them together.

15  If I repeat any instruction or idea do not conclude that it is more important than any other

16  instruction or idea just because I repeated it." *Id.* at 277:26-278:1. The court additionally

17  instructed, "Some of these instructions may not apply depending on your findings about the facts

18  of the case. Do not assume just because I gave a particular instruction that I am suggesting

19  anything about the facts." *Id.* at 278:11-16.

20        Both sides then presented closing arguments. *Id.* at 308:13-19:22. Defense counsel argued

21  that J. and her mother were inconsistent in their recollections of the alleged crime, *id.* at 311:13-

22  16, 312:4-13, 313:1-4, 313:18-314:1, and encouraged the jurors to consider "the timing and the

23  motivation of [P.'s] disclosure," *id.* at 314:20-25. Defense counsel also argued that the case should

24  not turn on "who do you believe . . . The burden is on [the government. It] has to prove beyond a

25  reasonable doubt that my client is guilty. My client doesn't have to prove his innocence." *Id.* at

26  315:19-25. Finally, with respect to the uncharged lesser included offense, described by defense

27  _____

28  [3] Petitioner incorrectly states that the government did not change its position regarding the lesser
    included instruction. *See* Att. A at 1.

counsel as the alternative count against J., defense counsel maintained his position that his client was innocent of any crime against J., but that "if you disagree with me, what she's describing, it is an attempt." *Id.* at 317:1-17, 317:27-28.

The California Court of Appeal provided the following accurate summary of the next day:

On December 3, 2009, the jury sent a written question, which had been signed by the foreman at 9:28 a.m. that morning, to the court. The jury asked with regard to count one: "Do we have the option of considering 288(A) as the charge for the crime against [P.] Doe? In other words—the crime without the force . . . component?" . . .

The court discussed the jury's question with the attorneys. The prosecutor requested new lesser included offense instructions. Defense counsel objected, stating: "Mr. Deanda has always denied the allegations, and he did so on the stand. Given that that was our defense it was for, again, strategic reasons that we objected to the inclusions of 288(a), as a lesser to Count 1 or any others, and I would just at this point wish to renew that objection." Defense counsel objected to any lesser included offense instructions: "Tactically we're not requesting any lesser included, be it misdemeanor or felony, we are approaching this as an all or nothing case, and given Mr. Deanda's denial of the allegations on the stand that's the purpose of us not wanting any lessers."

After discussions with counsel, the trial court gave supplemental lesser included offense instructions as to both counts and provided new verdict forms to the jury. The new instructions related to count one allowed the jury to alternatively find defendant had committed a nonforcible lewd or lascivious act upon P. in violation of section 288, subdivision (a) . . .

Cal. Ct. App. Order at 2-4 (footnote omitted). The new instructions and forms also gave the jury the option to alternatively find that Petitioner had committed battery or assault against J. and P. *Id.*

The court additionally told the jury, "All the instructions in the new packet . . . apply to the extent that you decide they are applicable based on the facts." 3 RT at 338:11-15. In addition, the court admonished, "If all of you agree the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater or lesser crimes, complete and sign the verdict form for not guilty . . . ." *Id.* at 344:16-20. "If all of you cannot agree . . . inform me of your disagreement, and do not complete or sign any verdict form." *Id.* at 344:3-7. The court concluded,

Jurors, you've asked the question were our original instructions for 288 correct? Yes, they were, and that is because prior to the new verdict forms that you have, the 288 (a) addressed only [J.].

United States District Court
Northern District of California

And now with the new verdict forms that you have, as we've explained, there is a 288(a) count or alternate count with respect to each of [J.] and [P.], and part of the work that I do with the lawyers is to be sure that the legal instructions reflect the evidence that you've received. So I'm hopeful that that is a useful answer to the question.

*Id.* at 354:13-24.

The jury then resumed deliberations and, after more than five hours, reached a verdict the next afternoon. On December 4, 2009, the jury found Petitioner guilty of the lesser included offense of a non-forcible lewd or lascivious act as to Count One and guilty of a non-forcible lewd or lascivious act as charged in Count Two. Cal. Ct. App. Order at 4.

### 2.   Court of Appeal Opinion

In his appeal, Petitioner claimed that "the [trial] court committed reversible error by instructing the jury, for the first time, on lesser included offenses after the jury had already commenced its deliberations." *Id.* at 17. The Court of Appeal rejected this argument.

The Court of Appeal began by noting that California courts have "clear[ly] recogni[zed] the rule that a trial court must instruct *sua sponte* on lesser included offenses as part of its duty to instruct *sua sponte* on the general principles of law governing the case." *Id.* at 19. With that in mind, the Court of Appeal was "unwilling to say that courts may never comply with their instructional obligation after the case has been submitted to the jury since such a rule would not necessarily serve the end of justice and would build in potentially reversible trial error." *Id.* at 21. Instead, the Court of Appeal explained that the principal cases cited by the Petitioner "examine the particular facts and circumstances of [a] case" to determine whether it must be reversed. *Id.* at 21.

Turning to the facts of Petitioner's case, the Court of Appeal considered and distinguished the California cases Petitioner relied upon in his appeal, *People v. Stouter*, 142 Cal. 146 (1904) and *People v. Jennings*, 22 Cal. App. 3d 945 (1972). The Court of Appeal noted that, unlike the juries in those cases, the jury in Petitioner's case was not deadlocked, had not been engaged in protracted deliberations when the trial court gave the new lesser included offense instructions, and did not return with its verdict immediately after receiving the supplemental instructions. *Id.* at 21-22, 25-26. Instead, the Court of Appeal found that "[t]he sequence and timing of the supplemental

instructions and jury verdicts do not demonstrate that the court's supplemental charge had a potential coercive effect on the jury." *Id.* at 22. In addition, the Court of Appeal considered the lesser included offense instruction in the context of the other instructions and found that "the content of the supplemental instructions does not suggest that the court was recommending a finding of guilt on some offense." *Id.* at 22.

The Court of Appeal also noted that Petitioner did not argue "that the lesser included offense instructions were inappropriate based on the evidence in the case" and "failed to identify any prejudice from the supplemental lesser included offense instructions." *Id.* at 20, 23. Rather, the Court of Appeal determined that the new instructions did not compromise Petitioner's defense of innocence and noted that "the court permitted counsel to make further closing arguments to the jury following the new instructions." *Id.* at 23.

The Court of Appeal next considered and rejected Petitioner's argument that "the new instructions, in conjunction with the judge's response to the jury's question . . . violated [Petitioner's] right to due process . . . by unfairly implying that the trial court was recommending the jury find him guilty of some offense." *Id.* at 23. Noting that "[w]hether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts," the Court of Appeal found that "the court's new instructions contemplated all possible outcomes, guilty verdicts, not guilty verdicts, and jury disagreement." *Id.* at 24. Reading the court's response in context, the Court of Appeal therefore determined that the "response was not reasonably likely to be understood by the jurors as urging or pressuring them to reach any particular outcome or suggesting any judicial opinion regarding guilt." *Id.* at 24.

In addition, the Court of Appeal found that the trial court's failure to repeat earlier instructions, such as "warning jurors not to 'assume just because I gave a particular instruction that I am suggesting anything about the facts' and not to 'take anything I say or do during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be,' . . . did not render the trial unfair." *Id.* at 26. The Court of Appeal noted that the trial court had offered those admonitions elsewhere in the jury instructions and "[i]n the absence of any reason to believe otherwise, [the Court of Appeal therefore] presume[d] the jury followed the court's instructions."

1  *Id.* at 26 (citing *People v. Martinez*, 47 Cal. 4th 911, 957 (2010)).

2       **3.  Analysis**

3       Petitioner now asks this Court to grant him relief from the Court of Appeal's decision.

4  While Petitioner does not directly argue that the Court of Appeal's decision was "contrary to" or

5  an "unreasonable application" of federal law, Petitioner lists *United States v. Welbeck*, 145 F.3d

6  493 (2d Cir. 1998) as a "Supporting Case" for his instructional error claim. Petitioner does not

7  apply *Welbeck* to the facts of his case, but cites to it for the proposition that "[m]ost reported state

8  decisions regarding the propriety of lesser included offense instructions given during deliberations

9  have reversed convictions based on a finding of particular harm to the defendant arising from the

10 specific circumstances of the case." Petition at 3 (citing *Welbeck*, 145 F.3d at 497). The Court

11 interprets this manner of briefing to suggest that Petitioner views *Welbeck* as showing that the

12 Court of Appeal's decision was "contrary to" or an "unreasonable application" of federal law. The

13 Court therefore considers *Welbeck*.

14      In *Welbeck*, the defendant was charged with possession of crack cocaine with intent to

15 distribute. *Id.* at 495. He was tried in federal court and, during deliberations, the jurors sent a note

16 to the court asking if they could consider simple possession as a lesser charge. *Id.* at 495-96. The

17 trial court agreed and instructed the jury on simple possession, of which the jury then convicted

18 the defendant. *Id.* at 496.

19      On appeal, the Second Circuit considered whether "it was error for the district court to

20 submit the lesser included offense to the deliberating jury without notice to [the defendant] prior to

21 summation or his consent." *Id.* at 496. The Second Circuit first noted that it "ha[d] found no

22 federal court opinions on the question" and that "[t]he weight of state authority holds that it would

23 not be appropriate to adopt a *per se* rule which would declare the belated giving of any lesser

24 included offense instruction to be prejudicial error." *Id.* at 496 (internal citation omitted).

25 Considering the facts before it, the Second Circuit then upheld the conviction because "[t]he

26 principal concern. . . that the stalled jury may regard the newly furnished theory of liability as the

27 court's recommendation to resolve the impasse by agreeing to the lesser offense . . . is not present

28

United States District Court
Northern District of California

1   where, as here, it was the jury that raised the question of a lesser included offense." *Id*. at 497.[4]

2          As Respondent correctly notes, because "circuit precedent does not constitute 'clearly

3   established Federal law, as determined by the Supreme Court,' [i]t . . . cannot form the basis for

4   habeas relief under AEDPA." *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012) (per curiam)

5   (citing 28 U.S.C. § 2254(d)(1). *See also Lopez v. Smith*, 135 S.Ct. 1, 4 (2014) (per curiam);

6   *Williams v. Taylor*, 529 U.S. 362, 381 (2000). Thus, *Welbeck*—a Second Circuit case that, far from

7   offering any clearly-established Supreme Court law regarding the practice of offering a lesser

8   included offense instruction during jury deliberations, instead expressly notes that no federal court

9   decision has addressed the issue—cannot entitle Petitioner to federal habeas relief.[5]

10         Furthermore, as Respondent correctly argues, even if circuit authority could entitle a

11  petitioner to habeas relief, *Welbeck* would not do so here. *See* Response at 18, n.6. If anything,

12  *Welbeck* would support a finding that no error occurred because "the initiative for the

13  supplemental instruction came from the jury itself," the new instruction did not undermine a trial

14  counsel's strategic choice, and counsel had the opportunity to make a supplemental closing

15  argument. *See Welbeck,* 145 F.3d at 496-97.

16         Petitioner has therefore failed to demonstrate that the state appellate court's determination

17  was an unreasonable application of Supreme Court authority. Rather, under Supreme Court

18  authority, to obtain federal collateral relief for errors in a jury charge, a petitioner must show that

19  the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

20  process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Cupp v. Naughten*, 414 U.S. 141,

21  147 (1973); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not

22  merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it

23  violated some [constitutional right].'"). The instruction may not be judged in artificial isolation,

24

25  ─────────────────
    [4] The Second Circuit also noted that any potential for prejudice is substantially lessened where the
26  new instruction does not undermine a strategic choice by trial counsel—such as arguing that the
    defendant may be guilty of possession but not intent to distribute—and may in such circumstances
27  be cured by giving counsel the opportunity to offer supplemental argument. *Id.* at 497.
    [5] In addition, as Respondent correctly identifies, *Welbeck* considered a federal criminal
28  prosecution and was therefore not governed by AEDPA.

United States District Court
Northern District of California

but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *See United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

Here, the Court of Appeal reasonably determined both that the challenged instruction was not incorrect under state law and that, even if it had been incorrect, it "did not render the trial unfair." The Court of Appeal correctly considered the challenged instruction in the context of the instructions as a whole and the trial record, noting the numerous admonitions the trial court gave telling jurors not to assume the court's position based on which instructions were given. The Court of Appeal's presumption that the jury then appropriately applied the jurt instructions is in accord with Supreme Court precedent. *See Waddington v. Sarausad,* 555 U.S. 179, 196 (2009). And the Court of Appeal's determination that the supplemental jury instructions did not render the trial unfair was reasonable. Therefore, the Court of Appeal's rejection of Petitioner's due process claim alleging instructional error was not objectively unreasonable. 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to habeas relief on this claim.[6]

## B.  Claim Two

Petitioner also brings an ineffective assistance of counsel claim, asserting that his attorney "completely abandoned his defense [of innocence] during supplementary closing argument, thereby rejecting [Petitioner's] testimony [and] requiring automatic reversal pursuant to [*U.S. v.*] *Cronic*, [466 U.S. 648 (1984)]." Att. A at 3.

---

[6] Petitioner also offers *Cole v. Arkansas*, 333 U.S. 196 (1948) as a "Supporting Case" for Claim One and quotes the following language: "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge . . . are among the constitutional rights of every accused in a criminal proceeding." Att. A at 3 (quoting *Cole*, 333 U.S. at 201). As with *Welbeck*, Petitioner offers no explanation of how *Cole* applies to his case, and Respondent contends that Petitioner's citation to *Cole* raises a separate, unexhausted lack-of-notice claim. *See* Response at 20-22. However, because Petitioner filed this amended petition specifically to excise all unexhausted claims after his mixed petition was dismissed and because he clearly defines "Claim One" as a challenge to the court's "new post-summation jury instructions" as "over the objection of trial counsel" and "indicat[ing] to the jury that the evidence was sufficient to convict of the lesser included offense" but makes no mention of notice, the Court does not read the petition as asserting a new unexhausted notice claim. The Court therefore does not address the merits of such a claim.

United States District Court
Northern District of California

**1. Background**

As above, the Court begins its review by summarizing the relevant additional facts

regarding Petitioner's defense at trial. In his opening, Petitioner's counsel emphasized the

importance of the jurors paying attention throughout trial because "[t]his is a classic he said/she

said type situation.." 2 RT 43:11-13. Counsel also told the jury there would be "inconsistencies,

the stories aren't going to make sense and there's also going to be allegations in the past that were

made by [P.] that were false." *Id.* at 43:21-24. During trial, Petitioner testified that he never

touched J., 3 RT 249:14-19, 262:2-28, nor P. inappropriately, *id.* at 256:15-257:9.

Defense counsel then gave closing argument, which the Court of Appeal accurately

summarized as follows:

> In the initial closing argument, defense counsel asked, "What was the evidence
> that you heard from that witness stand? What did [J.] say and [P.] say, and does
> what they said rise to the level of proof beyond a reasonable doubt?" *Id.* at
> 309:16-19. He argued that "even though one witness is enough in order to convict
> that witness's testimony and that witness's words have got [to] be gold in order for
> you to be able to rely on them." He pointed out why the testimony of each alleged
> victim was unreliable.
>
> Counsel also argued that the prosecution had the burden of proving defendant
> guilty beyond a reasonable doubt, which applied even if the jurors were skeptical
> of defendant's testimony. He acknowledged the "built-in" motive to lie that might
> exist for any defendant that testified and affect jurors' assessment of credibility.
> He argued: "[I]t's not who do you believe, do you believe [P.] and [J.], or do you
> believe Mr. Deanda. That isn't what your role is. That isn't what the Judge has
> instructed you to do. The burden is on Ms. West. She has to prove beyond a
> reasonable doubt that my client is guilty. My client doesn't have to prove his
> innocence." He argued: "Mr. Deanda didn't have to testify. Mr. Deanda did
> testify. I'm sure a number of you may not believe 100 percent of what he said,
> okay. Maybe there's some of you that believe 80 percent of what he said, maybe
> there are some of you that believe zero percent of what he said. So my suggestion
> in evaluating the case, the proper way, that the law instructs you to do is throw out
> his testimony entirely. Okay. Completely disregard, you believe zero percent of
> what he said. But it doesn't have any bearing, the fact that he testified, the fact that
> you believe zero percent of what he said. If that's the case, you know, extreme,
> I'm going to the logical extreme here, that doesn't change the fact that Ms. West
> has the burden of proving this case beyond a reasonable doubt. That's the state of
> the law."

Cal. Ct. App. Order at 27-28.

Following the supplemental jury instructions, Defense counsel then presented the

1 following supplemental closing argument:

2 Good afternoon, ladies and gentlemen. So yesterday as soon as I finished arguing
3 to you and I thought I was done, my body fell apart and I lost my voice. So I
apologize for the raspiness. Sometimes this happens being in trial, you're so sort
4 of worked up for the experience that as soon as you get a break and you sort of
feel like your job is done, at least for that particular trial. So there's a little of a
5 let-down. I think that's what happened to me. So please forgive my tone. I'm
operating on about half a cylinder at the moment.
6

7 But it's clear from your question that you passed along to the Judge this morning
that you're thinking about this idea of force. Thinking about what [the prosecutor]
8 was talking with you about, is the allegations made by P[.], is that 288(a) or that a
288(b)? The big difference between those two counts is force, and what does
9 force mean? So I just want to review with you very, very briefly. I'm not going to
speak for more than five minutes. What did the evidence show and when I say
10 evidence, I mean what did P[.] tell us, because that's really only the evidence we
have as to what happened is P[.]'s words.
11

12 He told us the following: One night when he was seven or eight he was over
spending the night at his grandmother's house, and when he was all alone with
13 Mr. Deanda in the living [room] Mr. Deanda asked him to come over and sit next
to him, said do you want to watch the video game, and Pedro did go over and sit
14 next to him. First Mr. Deanda touched Pedro's genitals and after a few minutes
Mr. Deanda took Pedro's hand and put it on his genitals. It was there for about
15 one to two minutes.
16

17 That's what Pedro told us. That's the evidence you have to look at and you have
to think about in deciding this is a 288(a) or is this a 288(b). So let's think about
18 what he didn't say. What didn't Pedro tell you, and this is important.

19 He didn't say that Mr. Deanda forcefully grabbed his hand. He didn't say that Mr.
Deanda squeezed his hand. He didn't say that Mr. Deanda hurt him. He didn't say
20 that he tried to resist or tried to pull his hand away when Mr. Deanda was holding
his hand. That never came up at all. In fact, the only thing that Pedro told you in
21 terms of how he felt when this was going on is that he said it felt weird. He didn't
say – he didn't hurt him, he didn't say he was injured, he just said he felt weird.
22 You know, granted, it has been some time, but he didn't even tell you he was
scared or having any particular difficulty talking about it, and I think that goes to
23 whether or not this is a situation where that sort of substantial extra something
was used. That extra was used which brings it from a 288(a) to 288(b).
24

25 The law requires something more. I mean, you know, the law distinguishes, and
good reason, for sex crimes that are done with force and that are done without
26 force. There are obviously you know, from a common sense perspective very
good reasons why those are considered separate crimes. So you have to look at
27 that extra element. What is that separates a 288(a) from 288(b)? Obviously you
figured out yourself is force. And do we have force in this particular case?
28

[The prosecutor], basically her argument is as follows: Force was used in this particular case, because P[.] didn't willingly place his hand on Mr. Deanda's genitals. It was against his will. He didn't want to do it. He was forced to do it. Okay. That therefore is force, the force element is met and therefore this is a [288(b)], and not a [288(a)], . . . and if I understand correctly and I don't want to speak for her and she can respond to this, that's her argument to be, that this was done against P[.]'s will, therefore force has been met.

Ladies and gentleman, this doesn't rise to the level of being that something more. The force as she's describing it, the taking P[.]'s hand and putting it on Mr. Deanda's genitals, that touching, that is part and parcel to the touching, the touching could not have happened but for his placing his hand on his genitals. Okay. If you—if you follow the argument out to a certain logical conclusion the only way this could have been a 288(a) is if P[.] on his own put his hands on Mr. Deanda's genitals. That just doesn't make any sense. There has to be force.

And look at the company of words that force is used in, and by the way, [the prosecutor] left one off, violence is one of the words you are going to find in the instructions, so look at the company of words. Force, fear, menace, duress, violence, and just use your common sense. Does it rise to the level where we should say, no, this is a different crime? We are going to distinguish between this sex crime because force was used in the same way that fear can be used, menace duress and violence? And, no it doesn't rise to that level. And thanks very much, and please again pardon my loss of voice.

3 RT 350-353.

### 3.   Court of Appeal Decision

The California Court of Appeal considered and rejected petitioner's claim "that his trial counsel abandoned the defense theory of innocence in closing argument, which compels an automatic reversal under *U.S. v. Cronic*, 466 U.S. 648 (1984)." Cal. Ct. App. Order at 27-33. Petitioner argued that counsel undermined him unnecessarily because "there were no glaring inconsistencies or contradictions in his testimony," but the Court of Appeal found that "his testimony was inconsistent in a multitude of respects" and that "[t]rial counsel was in a position to observe his client's demeanor and gauge the jury's reaction to his testimony." *Id.* at 28. The Court of Appeal therefore concluded that "Defendant's trial counsel may have reasonably determined that defendant had not come across as credible and, consequently, he should not comment on defendant's credibility based on the evidence." *Id.* at 28. Similarly, the Court of Appeal found that trial counsel "may have made the reasonable tactical decision, based on defendant's poor

1   performance as a witness, to downplay defendant's testimony, to aim for an acquittal on count one

2   based on the prosecution's failure to prove that defendant had used [force] . . . against P. given the

3   slight evidence of that element . . . and to focus on the inconsistencies in the evidence with respect

4   to . . . J. in his closing argument." *Id.* at 28-29 (internal citation omitted).

5       The Court of Appeal additionally found that "[t]he appellate record does not demonstrate

6   that defendant's trial counsel actually repudiated defendant's testimony or conceded his guilt"

7   because "Counsel referred to P.'s 'allegations' and did not suggest P. was more believable than

8   defendant." *Id.* at 29. The Court of Appeal furthermore determined that "trial counsel made the

9   decision to focus on the issue of force since the jury's question suggested that it was grappling

10  with that issue and this appears to be a reasonable tactic, especially in light of defendant's

11  credibility issues." *Id.* at 29. And the Court of Appeal found that "[i]t was a reasonable strategy for

12  defense to acknowledge the jurors' possible skepticism toward defendant's testimony to maintain

13  his credibility with the jury." *Id.* at 29 (citing *People v. Freeman*, 8 Cal. 4th 450, 498 (1994)).

14      The Court of Appeal next rejected Petitioner's ineffective assistance of counsel claim

15  based on his trial counsel's failure to remind the jury during supplemental closing that Petitioner

16  denied any improper touching, that the prosecution bears the burden of proving every element, and

17  that the jury should find Petitioner not guilty. *Id.* at 29-30. The Court of Appeal explained that

18  "'[t]he mere circumstance that a different, or better, argument could have been made is not a

19  sufficient basis for finding deficient performance by defense counsel.'" *Id.* at 30 (quoting *People*

20  *v. Ledesma*, 39 Cal.4th 641, 748 ((2006)).

21      The Court of Appeal then discussed *Cronic*'s holding at length and found that "[t]rial

22  counsel's closing argument does not reflect a breakdown of the adversarial process and defendant's

23  convictions are not subject to *Cronic*'s rule of automatic reversal." *Id.* at 30-33. The Court of

24  Appeal concluded that "trial counsel acted in the role of an advocate" and was not persuaded

25  otherwise by Petitioner's citations to old or inapplicable non-California cases. *Id.* at 32. The Court

26  of Appeal concluded, "[t]his case does not come within the parameters of *Cronic* and defendant's

27  convictions are not subject to automatic reversal without any showing of prejudice." *Id.* at 33.

28      **4. Analysis**

23

United States District Court
Northern District of California

1    Petitioner argues that the Court of Appeal's decision is "contrary to" and "an unreasonable

2    application of" *Cronic* because "it can never be a legitimate defense strategy to fatally undermine

3    your client's credibility while providing him with no corresponding benefit." Att. A at 6.

4    *Cronic* outlines three "circumstances that are so likely to prejudice the accused" that the

5    Sixth Amendment requires automatic reversal without inquiry into the effect at trial: first, "the

6    complete denial of counsel;" second, "if counsel entirely fails to subject the prosecution's case to

7    meaningful adversarial testing;" and third, "occasions when . . . the likelihood that any lawyer,

8    even a fully competent one, could provide effective assistance is so small that a presumption of

9    prejudice is appropriate." *Id.* at 658-660. "But apart from circumstances of this magnitude, 'there

10   is generally no basis for finding a Sixth Amendment violation unless the accused can show how

11   specific errors of counsel undermined the reliability of the finding of guilt.'" *Young v. Runnels*,

12   435 F.3d 1038, 1043 (9th Cir. 2006) (quoting *Cronic*, 466 U.S. at 659 n.26).

13   Petitioner argues that, here, the adversarial process broke down when "counsel disavowed

14   any credibility in Petitioner's testimony [and] effectively left Petitioner with no defense." Att. A at

15   6. Respondent contends that the Court of Appeal correctly found *Cronic* inapplicable. Ans. at 28.

16   The Court agrees with Respondent. As the Supreme Court explained in *Bell*, "When we spoke

17   in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the

18   prosecutor's case, we indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S.

19   685, 696-97. On the other hand, where the argument is that "counsel failed to [oppose the prosecution]

20   at specific points," *Strickland v. Washington*, 466 U.S. 668 applies. *Bell*, 535 U.S. at 697. The Court of

21   Appeal correctly found that *Strickland* applies.

22   Under *Strickland,* in order to prevail on a Sixth Amendment ineffective assistance claim,

23   the petitioner must establish that: (1) trial counsel's performance fell below an "objective standard

24   of reasonableness" under prevailing professional norms; and (2) the petitioner was prejudiced by

25   trial counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). A

26   federal habeas court must indulge a strong presumption that counsel's conduct falls within the

27   wide range of reasonable professional assistance. *Id.* at 689. If the petitioner establishes that

28   counsel's performance was deficient, in order to show prejudice the petitioner must demonstrate

1    that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

2    proceeding would have been different." *Id.* at 694; *see also Siripongs v. Calderon*, 133 F.3d 732,

3    737 (9th Cir. 1998) (it is unnecessary for a federal court considering a habeas claim of ineffective

4    assistance of counsel to address the prejudice prong of the Strickland test if the petitioner cannot

5    establish incompetence under the first prong). A "reasonable probability" is a probability

6    sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

7    In analyzing ineffective assistance of counsel claims under § 2254(d), a "doubly

8    deferential" standard of review is appropriate. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1403

9    (2011); *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). Under this deferential standard, "the

10   pivotal question is whether the state court's application of the *Strickland* standard was

11   unreasonable," not "whether defense counsel's performance fell below *Strickland*'s standard."

12   *Harrington*, 131 S.Ct. at 785. Thus, the State court "must be granted a deference and latitude that

13   are not in operation when the case involves review under the *Strickland* standard itself." *Id.* In

14   other words, a federal habeas court must use a standard of review that "gives both the state court

15   and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S.Ct. 10, 13 (2013) (citing

16   *Pinholster*, 131 S.Ct. at 1403).

17   Applying this deferential standard here, the Court finds that the Court of Appeal reasonably

18   concluded, based on the record, that defense counsel did not impugn petitioner's testimony, concede

19   his guilt, or abandon his defense. A review of the full record shows that the Court of Appeal

20   reasonably determined that defense counsel's decision to target his supplemental closing argument at

21   the jury's inquiry was tactical. Having already argued his client's innocence, counsel turned his

22   attention in an attempt to avoid a conviction on the most serious charge. The Court of Appeal

23   reasonably concluded that such argument did not constitute a complete failure to test the prosecutor's

24   case, but rather a sound strategic decision. Therefore, as noted above, the Court of Appeal correctly

25   determined that counsel's performance did not constitute *Cronic* error.

26   In addition, the Court of Appeal then correctly decided to apply *Strickland* and repeated its

27   reasonable finding that defense counsel never conceded Petitioner's guilt and instead chose to focus

28   his supplemental argument on the jury's question. Cal. Ct. App. Order at 33-34. The Court of Appeal

United States District Court
Northern District of California

25

exercised deference to counsel's tactical decisions. *Id.* at 34 (citing *Yarborough v.* Gentry, 540 U.S. 1 at 5-6 (2003)). In addition to concluding that  trial counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, the Court of Appeal found that "there is not a reasonably probability that the outcome would have been more favorable if trial counsel had instead vigorously in closing that defendant should be acquitted based on his testimony" because "[i]n all likelihood, defendant's inconsistent testimony seriously damaged his credibility with the jury." *Id.* at 35-36. The Court of Appeal concluded that Petitioner's claim therefore failed to satisfy *Strickland*'s requirement that it be "reasonably likely" that the result would have been different. *Id.* at 35. Thus, neither the Court of Appeal's rejection of petitioner's *Cronic* claim nor its application of *Strickland* was contrary to, or an unreasonable application of, clearly established Supreme Court law and Petitioner is not entitled to relief on this claim.

## V.    CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

Dated:  July 26, 2016

BETH LABSON FREEMAN
United States District Judge